IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARIA ERLINDA MEJIA MELGAR and E.N.C.M and D.G.C.M. (minors),<br><br>*Petitioners,*<br>v.<br><br>U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Immigration and Customs Enforcement ("ICE"); Jeh Johnson, Secretary of DHS; Loretta E. Lynch, Attorney General of the United States; R. Gil Kerlikowske, Commissioner of CBP; Sarah Saldaña, Director of ICE; Leon Rodriguez, Director of USCIS; Velda Griffin, Philadelphia Field Director, CBP; Thomas Decker, Philadelphia Field Office Director, ICE; Diane Edwards, Director, Berks County Residential Center,<br><br>*Respondents.* | CASE NO. _____ |

**PETITION FOR WRIT OF HABEAS CORPUS**

1

## INTRODUCTION

Petitioner Maria Erlinda Mejia Melgar fled Honduras with Petitioners E.N.C.M.[1], her eight-year-old son, and D.G.C.M.[2], her five-year-old son, to escape persecution by a notoriously violent group that recently tortured and murdered her family member. Maria is also fleeing persecution based on her close association with her long-term partner, who had reported a gang crime, thereby exposing them to gang retaliation. Knowing that the authorities in Honduras would not help them, Maria, E.N.C.M. and D.G.C.M fled to the United States.

Maria, E.N.C.M. and D.G.C.M. entered the United States in October 2015, and were subsequently apprehended by immigration agents near Laredo, Texas. Upon apprehension, Maria was afforded only a cursory administrative asylum hearing and all three Petitioners were subsequently issued "expedited removal" orders pursuant to 8 U.S.C. § 1225(b)(l). Absent court intervention, Petitioners will be deported to Honduras where they face certain physical harm or worse at the hands of gang members. Petitioners are currently detained at the Berks County Residential Center in Leesport, Pennsylvania.

Petitioners' expedited removal orders violated their statutory, regulatory and constitutional rights. Petitioners' hearing was procedurally unfair because it did not provide her with a meaningful opportunity to prove their claims. The expedited removal orders issued against Petitioners are also substantively unlawful because Petitioners can show a significantly possibility of prevailing on their claims for asylum and other forms of relief available to noncitizens fleeing persecution. Petitioners accordingly seek to vacate their existing removal orders and seek an order directing Respondents to provide them with a new, meaningful opportunity to apply for asylum and other persecution-based relief.

Petitioners respectfully allege, by undersigned counsel, as follows:

## JURISDICTION AND VENUE

---

[1] Pursuant to Federal Rule of Civil Procedure 5.2(a), the minor Petitioner is identified by his initials.

[2] *See supra*, fn. 1.

2

1. This case arises under the United States Constitution; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*; the regulations implementing the INA's asylum and expedited removal provisions; the Convention Against Torture ("CAT"), the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. This Court has jurisdiction pursuant to 8 U.S.C. § 1252(e)(2) (INA provision providing habeas jurisdiction over certain challenges to expedited removal); 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 2241 (general habeas statute); Art. I., § 9, Cl. 2 of the United States Constitution ("Suspension Clause"); Art. III of the United States Constitution; Amendment V to the United States Constitution; and the Common Law.

2. Petitioners are in federal immigration custody because they are subject to orders of removal and are presently detained at the Berks County Residential Center in Leesport, Pennsylvania.

3. Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred in this District.

4. No other petition, complaint, or appeal has been filed in any court in this matter.

**PARTIES**

5. Petitioner Maria is a 25-year-old native and citizen of Honduras who fled her home country with Petitioners E.N.C.M. and D.G.C.M., her minor sons, to seek asylum in the United States. E.N.C.M. is an 8-year-old native and citizen of Honduras. D.G.C.M is a 5-year-old native and citizen of Honduras. Petitioners entered into United States in October 2015, and were subsequently apprehended by immigration agents.

6. Respondent U.S. Department of Homeland Security ("DHS") has responsibility for enforcing the immigration laws of the United States.

7. Respondent U.S. Customs and Border Protection ("CBP") is the sub-agency of DHS that is responsible for the initial processing and detention of noncitizens who are apprehended near the border and placed in expedited removal proceedings.

8. Respondent U.S. Citizenship and Immigration Services ("USCIS") is the sub-agency of DHS that, through its Asylum Officers, conducts interviews of certain individuals placed in expedited removal to determine whether they have a credible fear of persecution and should be permitted to apply for asylum.

9. Respondent U.S. Immigration and Customs Enforcement ("ICE") is the sub-agency of DHS that is responsible for carrying out removal orders and operates and oversees the Eloy detention facility.

10. Respondent Jeh Johnson is sued in his official capacity as the Secretary of the Department of Homeland Security. In this capacity, he directs each of the component agencies within DHS, ICE, USCIS, and CBP. As a result, Respondent Johnson has responsibility for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, is empowered to grant asylum or other relief, and is a legal custodian of Petitioners.

11. Respondent Loretta E. Lynch is sued in her official capacity as the Attorney General of the United States. In this capacity, she has responsibility for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, oversees the Executive Office of Immigration Review, is empowered to grant asylum or other relief, and is a legal custodian of Petitioners.

12. Respondent Sarah Saldaña is sued in her official capacity as the Director of ICE, and is a legal custodian of Petitioners.

13. Respondent Leon Rodriguez is sued in his official capacity as the Director of USCIS.

14. Respondent R. Gil Kerlikowske is sued in his official capacity as the Commissioner of CBP.

15. Respondent Velda Griffin is sued in her official capacity as the Philadelphia Field Director of CBP.

16. Respondent Thomas Decker is sued in his official capacity as the Philadelphia Field Office Director of ICE.

17. Respondent Diane Edwards is sued in her official capacity of the Director of the Berks County Residential Center.

## STATUTORY BACKGROUND

**Jurisdiction:**

18. In general, a final removal order must be challenged directly in the court of appeals by petition for review. 8 U.S.C. § 1252(a)(1).

19. However, with respect to expedited removal orders issued pursuant to 8 U.S.C. § 1225(b)(1), Congress has provided that such orders are reviewable in district court habeas proceedings. 8 U.S.C. § 1252(e)(2).

**The Expedited Removal Scheme:**

20. Under 8 U.S.C. § 1225(b)(1), certain persons who are seeking admission to the United States may be placed into "expedited removal" proceedings. Section 1225(b)(1)(A)(i) authorizes the Attorney General to apply expedited removal to certain inadmissible noncitizens who are "arriving" in the United States and seeking admission at a port of entry. *Id.*; 8 C.F.R. § 1.2 (defining "arriving aliens" as including "applicant[s] for admission coming or attempting to come into the United States at a port-of-entry").

21. Section 1225(b)(1)(A)(iii) also authorizes the Attorney General to apply expedited removal to certain inadmissible noncitizens located within the United States "who have not been admitted or paroled" and who cannot demonstrate that they have been continuously physically present in the United States for two years. 8 U.S.C. § 1225(b)(1)(A)(iii). Pursuant to that

provision, in 2004, the Attorney General began to apply expedited removal to persons within the United States who are allegedly apprehended within 100 miles of the border and who are unable to demonstrate that they have been physically present in the United States for 14 days. *See* 69 Fed. Reg. 48877 (Aug. 11, 2004). Petitioners entered the United States, were arrested in the United States, and were placed into expedited removal under this authorization.

22. All persons subject to expedited removal are entitled to an interview with an asylum officer if they indicate either an intention to apply for asylum or a fear of returning to their country. 8 U.S.C. § 1225(b)(1)(A)(ii); 8 C.F.R. § 235.3(b)(4) (providing that if "an alien subject to the expedited removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country, the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer"); 8 U.S.C. § 1225(b)(1)(B) (setting forth procedure for interviews by asylum officers to determine whether the noncitizen has a "credible fear of persecution"); *see also* 8 C.F.R. § 208.30.

23. If the noncitizen is referred to an asylum officer, the officer conducts a "credible fear interview" which is designed "to elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture." 8 C.F.R. § 208.30(d).

24. Children who arrived with a parent may choose to be included as part of their parent's credible fear evaluation and determination, or may exercise their right to have their claims evaluated and determined separately. 8 C.F.R. § 208.30(b).

25. The asylum officer must "conduct the interview in a non-adversarial manner, separate and apart from the general public." 8 C.F.R. § 208.30(d). If the asylum officer determines that an individual "is unable to participate effectively in the interview because of illness, fatigue, or other impediments, the officer may reschedule the interview." 8 C.F.R. § 208.30(d)(1). The asylum officer is required to determine that the individual "has an understanding of the credible fear determination process." 8 C.F.R. § 208.30(d)(2).

26. The statute and the regulations further provide that the noncitizen has a right to "consult with a person or persons of the alien's choosing prior to the interview or any review thereof." 8 U.S.C. § 1225(b)(1)(B)(iv); 8 C.F.R. § 208.30(d)(4). "Any person or persons with whom the alien chooses to consult may be present at the interview," and may be allowed to present a statement at the end of the interview. 8 C.F.R. § 208.30(d)(4). If the noncitizen "is unable to proceed effectively in English," and the asylum officer "is unable to proceed competently in a language chosen by the alien," the officer "shall arrange for the assistance of an interpreter in conducting the interview." 8 C.F.R. § 208.30(d)(5).

27. At the conclusion of the interview, the asylum officer must create a written summary of the "material facts" provided during the interview, review that summary with the individual and provide him/her with the opportunity to correct any errors. 8 C.F.R. § 208.30(d)(6); *see also* 8 USC § 1225(b)(1)(B)(iii)(II). If the asylum officer makes a negative credible fear determination, the officer must provide a written record of the determination that "shall include . . . the officer's analysis of why, in light of [the] facts, the alien has not established a credible fear of persecution." 8 USC § 1225(b)(1)(B)(iii)(II).

28. Upon the individual's request, the agency must provide for prompt review of the asylum officer's determination by an immigration judge. 8 U.S.C. § 1225(b)(1)(B)(iii)(III); *see also* 8 C.F.R. § 208.30(g)(1).

29. The immigration judge "may receive into evidence any oral or written statement which is material and relevant to any issue in the review." 8 C.F.R. § 1003.42 (c). And the statute specifies that the immigration judge review must include an opportunity for the individual "to be heard and questioned by the immigration judge, either in person or by telephonic or video connection . . . ." 8 U.S.C. § 1225(b)(1)(B)(iii)(III).

30. The immigration judge's decision "is final and may not be appealed." 8 C.F.R. § 1208.30(g)(2)(iv)(A). However, an immigration judge "may upon his or her own motion at any time, or upon motion of the Service or the alien, reopen or reconsider any case in which he or she has made a decision[.]" 8 C.F.R. § 1003.23(b)(1).

31. Likewise, an asylum officer may reconsider a negative determination. 8 C.F.R. § 1208.30(g)(2)(iv)(A). If reconsideration is granted, a new interview under 8 U.S.C. § 1225(b)(1)(B) must be conducted, and a new credible fear determination must be made. In the event of a negative determination, a written record is required, 8 U.S.C. § 1225(b)(1)(B)(iii)(II), and the applicant has a right to administrative review by an immigration judge, 8 U.S.C. § 1225(b)(1)(B)(iii)(III).

32. When a noncitizen is granted a credible fear interview, she is entitled to the procedural protections set forth by statute and regulation, including the right to seek administrative review of any negative credible fear determination. *See also* Michael A Benson, Executive Assoc. Commissioner for Field Operations, Immigration & Naturalization Service, Memorandum, Expedited Removal: Additional Policy Guidance (Dec. 30, 1997) ("Re-interviews will occur when the Office of International Affairs determines that the alien has made a reasonable claim that compelling new information concerning the case exists and should be considered. Districts should cooperate by continuing to detain the alien until the second adjudication, and potentially also a second review by the immigration judge, is completed.").

33. To prevail on an asylum claim, the applicant must establish that there is at least a 10% chance that he or she will be persecuted on account of one of the listed grounds, including belonging to a particular social group, such as religion or a group persecuted by gangs. Critically, however, to prevail at the *credible fear* interview, Congress did not require applicants to establish their ultimate entitlement to asylum, *i.e.*, a 10% chance of being persecuted. Rather, to prevail at a credible fear interview, the applicant need only show "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum . . . ." 8 U.S.C. § 1225(b)(1)(B)(v). Thus, to prevail at the credible fear stage, applicants need only show a *significant possibility* that there is a *10% chance* of persecution if they are returned to their home country.

34. If a noncitizen is found by the asylum officer to have a "credible fear," she may not be removed until her application for asylum is adjudicated in a full removal hearing. *See* 8 U.S.C. § 1225(b)(1)(B)(ii) ("If the officer determines at the time of the interview that an alien has a credible fear of persecution . . . , the alien shall be detained for further consideration of the application for asylum.").

35. Noncitizens who satisfy the credible fear standard are taken out of the expedited removal system altogether and placed into the regular (INA Section 240) removal process. 8 U.S.C. § 1229; INA § 240. At the Section 240 hearing, they will have the opportunity to develop a full record before an immigration judge, and may appeal an adverse decision to the BIA and federal court of appeals. 8 C.F.R. § 208.30 (f); *see also* 8 U.S.C. § 1225(b)(1)(B)(ii).

36. The reason for the low threshold at the credible fear stage is straightforward. An asylum claim is highly fact-specific and often will take significant amount of time, resources and expertise to develop properly, including expert testimony and extensive country conditions evidence. It is thus highly unrealistic for applicants in the expedited removal system, especially if unrepresented, to present an adequate asylum claim while in detention and under severe time constraints. Accordingly, by establishing a low threshold at the credible fear stage, Congress ensured that potentially valid asylum claims could be developed properly and presented in a full Section 240 hearing before an immigration judge.

## FACTUAL BACKGROUND

37. Maria is a 25-year-old Honduran mother, who, together with her 8-year-old and 5-year-old sons, E.N.C.M. and D.G.C.M., is seeking protection in the United States. Petitioners fled to the United States in order to escape persecution by a notoriously violent group that murdered her family member and targeted her for gender-based violence, as well as to flee retaliation by gang members who have targeted her and her family after her long-term partner reported a gang crime.

38. Maria's family has been targeted by Los Peludos, a group known throughout Honduras for their brutality and violence, including their sexual attacks on women.

39. At the end of March 2014, Los Peludos murdered and tortured Maria's uncle, Rigoberto, and his friend and co-worker. Rigoberto disappeared after work and was not found until three days later, dead next to his friend and coworker; his nose had been cut off, his ear pulled out, and his finger cut. There was no police investigation, but it is generally believed that Los Peludos were responsible.

40. Maria and her family feared that Los Peludos would attack the rest of the family. Los Peludos knew that Maria was in the same family as Rigoberto, and the group would come around to the neighborhood where she and her family lived, forcing Maria and her family to stay indoors out of fear.

41. Maria was particularly vulnerable, not only because of her family relationship to Rigoberto, but as a single woman living in Honduras, since her partner Noe left for the United States in April 2014. It was well known that Maria was living alone with her children, with no man to protect her.

42. Los Peludos began targeting Maria in particular. Otto, one of Los Peludos, repeatedly threatened Maria, telling her that he would make Maria become "his woman" and move in with him. Maria refused his advances.

43. More recently in 2015, about fifteen days before Petitioners fled to the United States, Otto attacked Maria while she was on her way to buy groceries. When Maria again refused his advances, Otto told her that she could either be with him willingly or he would force her, but that one way or another, she was going to come with him. He told her that if she did not come willingly, she would pay and her children would have to pay. He pinned her against a street post using a knife and told her to stay quiet, not to yell.

44. Maria was only narrowly able to escape when she broke into hysterical tears and began to attract public attention.

45. Maria knows other women and children who have experienced similar threats from Los Peludos. In addition, her mother told her about how they used a stick to brutally rape a 10-year-old boy in a nearby town and left him for dead. Although everyone knew Los Peludos were

responsible, the police did nothing. It is also commonly known that these men have raped women throughout Honduras without any consequence or prosecution by the police, and Maria knows that they are still roaming freely.

46. Like others who have cooperated with the police, Maria and her family also fear retaliation and persecution from other gang members in Honduras. In November 2008, Maria's long-term partner and father of her children, Noe, witnessed a gang member murder his brother in front of him. Noe reported the incident to the police, and later testified in court against the gang member. The gang member had committed a series of crimes in the past, but never been turned over before this instance.

47. As a result of Noe's cooperation with the police, he and Maria have been fearful of retaliation from gang members. They learned that four men had visited their old apartment shortly after they moved out, and even after they moved to another part of Honduras, another gang member tried to find Noe in the hospital when he was there to be treated for a burn.

48. Maria and her two children left Honduras fifteen days after the incident with Otto. In the interim period, they hid inside their house out of terror.

49. Maria is still deeply traumatized by her experiences. Even when she attempted to speak to a psychologist at the Karnes County Residential Center, Maria was unable to share what has happened to her and broke down into hysterical tears.

50. Maria is particularly traumatized because she was sexually assaulted at a young age. When she was 15 years old, she was approached by an older man who grabbed her by a bridge and nearly succeeded in raping her. Maria never told anyone in her family about the incident because of her shame and anguish about what happened to her.

51. It is well known that the authorities in Honduras are unable to provide protection from gender-based violence or violence and retaliation by gangs.

52. Gang activity is widespread in Honduras, and gangs are in de facto control of many areas. Central American gangs perpetrate "pervasive, pernicious, and often uncontrollable violence and disruption in the region." U.N. High Comm'r for Refugees, *Children on the Run:*

*Unaccompanied Children Leaving Central America and the Need for International Protection* 16 (2014) [hereinafter *Children on the Run*], *available at* www.unhcrwashington.org/sites/default/files/1_UAC_Children%20on%20the%20Run_Full%20Report.pdf. The effects of this violence "influence every pillar and institution in the affected countries." *Id.* at 17. *See also* Randal C. Archibald, "Hope dwindles for Hondurans living in peril," N.Y. Times (Aug. 2, 2014) [hereinafter Hope Dwindles for Hondurans] *available at* http://www.nytimes.com/2014/08/03/world/americas/hope-dwindles-for-hondurans-living-in-peril.html ("[I]n Honduras, with the political instability, deeper poverty and a history of willfully weak judicial and security forces, the gangs have exploded in power and readily acquire military-grade weaponry.")

53. Reports make clear that Honduran authorities are unable to provide protection from the gangs, and are ineffective and nonresponsive to citizens' reports of harm or threats by gangs. *See, e.g., Children on the Run, supra,* at 17 (2014) ("Protection mechanisms are weak, and there is substantial evidence that the State has been co-opted and corrupted by highly organized non-State criminal actors in many areas, creating 'zones of impunity.'"); U.S. Dep't of State, Honduras 2014 Human Rights Report 11 (2014), *available at* http://www.state.gov/j/drl/rls/hrrpt/humanrightsreport/index.htm?year=2014&dlid=236698#wrapper ("Common challenges to criminal prosecutions included . . . lack of witness protection, widespread public distrust of the legal system, and judicial corruption."); Women's Refugee Comm'n, Women's Refugee Comm'n, Forced from Home: The Lost Boys and Girls of Central America 9 (2012) [hereinafter Forced from Home], at 1, *available at* https://womensrefugeecommission.org/resources/document/844-forced-from-home-the-lost-boys-and-girls-of-central-america (reporting "[w]idespread police corruption and high levels of impunity have impaired any effective state response" to gang violence targeting children); *id.* at 1 (identifying "most serious" human rights concerns as "corruption, intimidation, and institutional weakness of the justice system" and explaining that these phenomena "lead[] to widespread impunity" and "unlawful and arbitrary killings by security forces"); Initiative for

Peacebuilding, Nine Strategies to Prevent Violence in Central America 6, 8 (2012) [hereinafter Nine Strategies], at 10, *available at* http://www.interpeace.org/publications/central-american-youth-programme/328-nine-strategies-to-prevent-youth-violence-in-central-america-english/file ("The failure of the criminal justice system[] to consistently investigate and prosecute crime has led to high levels of impunity."); *see also* Women's Tribunal against Femicide, How the Threads of Impunity are Sewn Together 7 (2011), *available at* http://www.contralosfemicidios.hn/publicaciones/item/how-the-threads-of-impunity-are-sewn-together (stating 2009 coup d'état "undermined Honduras' already weakened State institutions, promoting impunity"); United States Conf. of Catholic Bishops, Mission to Central America: The Flight of Unaccompanied Children 5 (Nov. 2013), [hereinafter Flight of Unaccompanied Children], at 8, available at http://www.usccb.org/about/migration-policy/upload/Mission-To-Central-America-FINAL-2.Pdf (finding that the Honduras government's law enforcement, child and social welfare, and educational systems each lacked the capacity to protect children from gang violence).

54. Further, it is common knowledge that gangs in Honduras retaliate against individuals or families who report them to the police/authorities or who express opposition to them. *See* Jason Buch, "For Mother from Honduras, a Difficult Decision," San Antonio Express News (May 19, 2015, 11:51 A.M.), *available at* http://www.expressnews.com/news/local/article/For-mother-from-Honduras-a-difficult-decision-6271658.php ("[Honduras's] criminal groups operate with great impunity . . . and opposing governmental policies and speaking out against the gangs are both dangerous."); Claire Ribando Seelke, Cong. Research Serv., Gangs in Central America 4 (2014), *available at* https://www.fas.org/sgp/crs/row/RL34112.pdf ("Gangs have increasingly been involved in extortions of residents . . . in major cities throughout the region. Failure to pay often results in harassment or violence by gang members."); *see, e.g.*, James Bargent, "Explanation of the Occult Meanings of Honduran Gang Tattoos," (Sept. 3, 2014) (explaining particular tattoo intended to remind gang members that "mothers can be assassinated in retaliation" for desertion); Tracy Wilkinson, "The Honduras Neighborhood of Chamelecon is a

Network of Gang Turfs Where Residents' Survival Depends on Playing by Gang Rules," L.A. Times (Dec. 17, 2013), *available at* http://www.latimes.com/world/la-fg-c1-honduras-violence-20131216-dto-htmlstory.html ("The gangs charge what residents call a war tax, extorted from homes and business, down to the smallest fruit vendor. You don't pay, you get out. And if you don't go, you get killed."); "Inside the World's Deadliest Country: Honduras, Associated Press (Dec. 13, 2012, 12:20 A.M.), *available at* http://www.cbsnews.com/news/inside-the-worlds-deadliest-country-honduras/ ("In one night, we saw the bodies of two bus drivers who had been killed for refusing to pay a cut to gangs . . . and three people shot dead in a pool hall for what was described as 'a settling of accounts.'").

55. In addition, it is well known that violence against women is widespread in Honduras and the authorities are unable or unwilling to provide protection. The *2014 Honduras State Department Human Rights Report* notes that "[v]iolence against women and impunity for perpetrators continued to be a serious problem [in Honduras]." U.S. Dep't. of State, *Honduras 2014 Human Rights Report*, 20.

56. Honduran authorities fail to prosecute many sexual crimes, leading to high impunity rates for sexual violence against women. *Id.* at 20-21; *see also* Press Release, UN News Centre, Honduras Must Address Widespread Impunity for Crimes Against Women, Girls – UN expert (July 10, 2014), http://www.un.org/apps/news/story.asp?NewsID=48241#.VmjlCOODGkq ("It is reported that there is a 95 per cent impunity rate for sexual violence and femicide crimes.").

57. Brutal stories of rape and violence against vulnerable women and young girls are common in Honduras. *See, e.g.*, Sonia Nazario, Opinion, *The Children of the Drug Wars*, N.Y. Times, July 11, 2014 ("Girls face particular dangers — one reason around 40 percent of children who arrived in the United States this year were girls, compared with 27 percent in the past. Recently three girls were raped and killed in Nueva Suyapa, [a community in the capital, Tegucigalpa] one only 8 years old. Two 15-year-olds were abducted and raped.").

58. Understandably terrified for her life and the life of her children, Maria fled Honduras with E.N.C.M. and D.G.C.M. to seek protection in the United States in or about October 2015. Petitioners were apprehended after entering the United States.

## ADMINISTRATIVE DECISIONS

59. Petitioners were issued expedited removal orders after the government determined that they did not have a credible fear of persecution. The process that led to these expedited removal orders was wholly inadequate.

60. For example, Maria was unrepresented by counsel and unfamiliar with the asylum process, and did not understand that the interview was completely confidential. *See* 8 C.F.R. § 208.30(d)(2) (providing that the asylum officer is required to determine that the individual "has an understanding of the credible fear determination process"). In addition, the asylum officer interviewing her was a man.

61. Maria was also understandably traumatized, upset, and nervous, and had gone to see the psychologist at the detention facility several times. In her several visits to the psychologist, she had been unable to speak about the attacks she suffered. She was also concerned during her credible fear interview because E.N.C.M. was very sick at the time, and she had to be separated from him to do the interview. The asylum officer nonetheless failed to reschedule the interview. *See* 8 C.F.R. § 208.30(d)(1) (providing for rescheduling if the asylum officer determines that an individual "is unable to participate effectively in the interview because of illness, fatigue, or other impediments").

62. Maria thus was not effectively able to participate in the interview and did not have a meaningful opportunity to speak fully about the persecution she had experienced in Honduras, including sexual assault from her adolescence and adulthood, and the threats she and her family received.

63. In addition, the asylum officer failed to "to elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture." 8 C.F.R. § 208.30(d).

64. Further, the asylum officer failed to provide any reasoning or analysis, in violation of 8 U.S.C. § 1225(b)(1)(B)(iii)(II)'s requirement that an officer provide a written determination that includes his or her analysis of why, in light of the facts, the individual has not established a credible fear of persecution.

65. An immigration judge affirmed the asylum officer's credible fear determination, compounding the errors.

66. Maria requested a new credible fear interview, *see* 8 C.F.R. § 1208.30(g)(2)(iv)(A), but has not been provided one.

67. The credible fear process and determination were substantively flawed in multiple respects. Under the correct standard – which requires only that an applicant show a significant possibility there is a 10% chance of establishing eligibility for asylum, or a significant possibility of establishing eligibility for withholding of removal or CAT– Petitioners would have prevailed.

68. The Defendants have long had a policy and procedure authorizing reconsideration requests and have promulgated a regulation codifying the long history of policy and procedure for adjudicating reconsideration requests.

69. Maria's reconsideration requests should have been granted.

## EXHAUSTION

70. There are no further administrative procedures that Petitioners are required to exhaust.

## CAUSES OF ACTION

### Count One

**(Violation of the Immigration and Nationality Act; the Foreign Affairs Reform and Restructuring Act of 1998; the United Nations Convention Against Torture; the APA; and Implementing Regulations)**

71. All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

72. Respondents have violated Petitioners' statutory and regulatory rights by depriving them of a meaningful right to apply for asylum, withholding of removal, and Convention Against

Torture ("CAT") relief under the governing statutes and regulations. *See* Immigration and Nationality Act ("INA") and implementing regulations, 8 U.S.C. § 1225(b)(1) (expedited removal), 8 C.F.R. §§ 235.3(b)(4), 208.30, and 1003.42; 8 U.S.C. § 1158 (asylum); 8 U.S.C. § 1231(b)(3) (withholding of removal); and the United Nations Convention Against Torture, implemented in the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub.L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231).

73. These provisions entitle Petitioners to a fair procedure to apply for asylum, withholding of removal, and CAT relief. Petitioners' procedural rights guaranteed by these statutes and regulations were violated.

74. Petitioners' substantive rights were also violated. Petitioners were ordered removed despite the fact that they can show a significantly possibility that they could establish eligibility for asylum, withholding of removal, and CAT claims.

75. Petitioners should have prevailed in establishing a credible fear and would thus have been allowed to pursue their claims for asylum, withholding of removal and protection under the Convention Against Torture in regular Section 240 immigration proceedings.

### Count Two

### (Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution)

76. All of the foregoing allegations are repeated and realleged as though fully set forth herein.

77. The Due Process Clause of the Fifth Amendment to the United States Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."

78. Petitioners, having effected entry into the United States by crossing the border, are indisputably present in the United States and entitled to the protections of the Due Process Clause.

79. Petitioners' due process rights were violated by the asylum officer and immigration judge in not providing them with a meaningful opportunity to establish their claims, and in not providing them with a reasoned explanation for their decisions.

80. Under constitutionally adequate procedures, Petitioners would have prevailed on their claims.

## PRAYER FOR RELIEF

**WHEREFORE**, Petitioners respectfully pray the Court to:

a. Issue an Order directing Respondents to show cause why the writ should not be granted;

b. Declare Petitioners' expedited removal orders contrary to law;

c. Enter an order directing Respondents to vacate the expedited removal orders entered against Petitioners;

d. Issue a writ of habeas corpus, an injunction, or a writ of mandamus directing Respondents to provide Petitioners a new opportunity to apply for asylum and other applicable forms of relief; and

e. Grant such further relief as the Court deems just and proper.

Dated: December 11, 2015

Respectfully submitted,

By: /s/ Stephen G. Harvey

Stephen G. Harvey
David V. Dzara
Steve Harvey Law LLC
1880 John F. Kennedy Blvd.
Suite 1715
Philadelphia, PA 19103
T: 215-438-6600
*steve@steveharveylaw.com*

*Counsel for Petitioner*

Bridget Cambria, Esq.
Cambria & Kline PC—Attorneys at Law
123 N. 3rd Street
Reading, PA 19601
T: (484) 926-2014
*bridget.cambria@cambriaklinelaw.com*

*Counsel for Petitioner*

Mary Catherine Roper
Molly Tack-Hooper
American Civil Liberties Union of
Pennsylvania
P.O. Box 60173
Philadelphia, PA 19102
T: 215-592-1513 x113
*mroper@aclupa.org*
*mtackhooper@aclupa.org*

*Of Counsel on Habeas Jurisdiction*

Lee Gelernt*
Lindsay Nash*
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2616
*lgelernt@aclu.org*
*lnash@aclu.org*

*Of Counsel on Habeas Jurisdiction*

Jennifer Chang Newell*
Stephen Kang*
American Civil Liberties Union Foundation
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0774
*jnewell@aclu.org*
*skang@aclu.org*

*Of Counsel on Habeas Jurisdiction*

*Pro Hac Vice Motions Forthcoming*

20

*Pro Hac Vice Motions Forthcoming*